IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-40051
_____


MARTIN BELLOWS, Individually and
on Behalf of Phillips Industrial
Constructors, Inc.,

                                        Plaintiff-Appellee,

        versus

AMOCO OIL COMPANY; ET AL,

                                        Defendants,

AMOCO OIL COMPANY, TEXAS
CITY REFINERY,

                                        Defendant-Appellant.


_____

Appeal from the United States District Court for the
Southern District of Texas
_____
July 16, 1997

Before GARWOOD, WIENER and DEMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

     Plaintiffs Martin J. Bellow[1] (Bellow) and Phillips Industrial

Constructors, Inc. (PICI), a Texas corporation, brought this

lawsuit against defendant Amoco Oil Company, Texas City refinery

(Amoco), alleging that Amoco discriminated against them on the

basis of their race by terminating, modifying, or changing their

right to contract in violation of 42 U.S.C. § 1981.  A jury

---

[1] Bellow's name was misspelled ("Bellows") in the original pleadings and, consequently, in the caption of the case as well. This caption misspelling was never corrected below.

returned a verdict in favor of Bellow, awarding him $50,000 in "subjective damages" and $225,000 in punitive damages.  We reverse.

## Facts and Proceedings Below

Bellow, an African-American, began working in the construction business in 1970, working primarily in Texas City, Texas, and the surrounding Gulf Coast area specializing in civil construction and equipment operations.  In 1974, Bellow met Harold Phillips (Phillips), a Caucasian, while they both worked for the same construction company.  They instantly became friends, and over the next several years Bellow and Phillips continued to work together, first at the M.W. Kellogg Company, then at Byrd Construction, and later at Callie Construction.

In the summer of 1978, Phillips left Callie Construction and, with his wife, formed his own construction firm, PICI, a corporation organized under Texas law.  During the first six months of its operation, PICI had difficulty obtaining construction work.[2] In early 1979, Phillips learned that Amoco was seeking qualified minority-owned construction firms to perform maintenance and construction work at its Texas City refinery.  To take advantage of this opportunity, Phillips approached Bellow in March 1979 and offered him a 51% ownership interest in PICI.  Bellow accepted the offer and became the president of PICI, while Phillips became PICI's vice-president and general manager, owning 49% of the

---

[2] During those six months, PICI managed to secure only two small construction jobs valued at less than $20,000.

corporation's stock.[3]  On March 3, 1979, Bellow and Phillips wrote a letter to Amoco informing it of PICI's new status as a minority-owned construction firm.  Soon thereafter, PICI began receiving general maintenance and construction work from Amoco.

Beginning in 1979, and lasting throughout the 1980s, PICI's business relationship with Amoco flourished.  During this time, almost all of PICI's business involved work from Amoco's refinery. PICI performed a variety of civil construction and related maintenance work for Amoco, producing several millions of dollars in annual gross revenues for PICI (the amended complaint alleges that PICI's gross receipts from the Amoco refinery totaled over 32 million dollars from January 1985 through June 1994).  Bellow worked primarily in the field as a superintendent overseeing the work of PICI crews at the refinery, while Phillips was responsible mainly for the day-to-day administrative duties at the office.

PICI's decade of prosperity came to an end, however.  Sometime during the mid-1980s, Amoco began reevaluating its use of contractors and suppliers at the Texas City refinery.  At one point, over 3,000 contractors and suppliers performed work for the refinery.  In an effort to improve its monitoring of contractors and increase its efficiency, Amoco decided to reduce the number of contractors through "contract consolidation."  Under this consolidation process, Amoco decided to use a single, primary

---

[3]    Bellow acquired 5,100 shares of the stock and Phillips retained 4,900 shares.  Because Phillips had already invested $9,000 in the corporation, Bellow agreed to work for six months without pay in exchange for the 5,100 shares of stock.

contractor to perform most of the construction and related maintenance work that its own personnel could not handle.[4] In 1989, Amoco began informing its construction contractors, including PICI, that it would begin using Brown & Root Industrial Services (BRIS) as its primary outside maintenance contractor.[5] Under its new contract consolidation policy, construction jobs would first be assigned to Amoco personnel. If Amoco personnel were unavailable, the job would be assigned to BRIS. If BRIS did not have the personnel available or lacked the expertise for a particular job, Amoco's Contracts group would either bid the job to outside contractors[6] or hire a contractor under a cost-plus contract.[7]

---

[4]    According to Richard Evans, vice-president of refining and engineering at Amoco, Amoco's competitors at the time had already moved in the direction of using a single contractor.

[5]    It was undisputed that none of the individual defendants in this case had a hand in Amoco's contract consolidation decision or the decision to hire BRIS as the new primary contractor. Also, Bellow conceded at trial that Amoco's decision to utilize BRIS as the primary outside general maintenance contractor was not motivated by racial animus.

[6]    At Amoco, two groups worked directly with outside contractors such as PICI. The Contracts Administration group (Contracts group) in the purchasing department was responsible for awarding contracts to outside contractors, including the selection of contractors, providing the terms of the contract, and authorizing payment to contractors. The other group was the Plant Support and Contracting group (PS&C group) in the maintenance department. The PS&C group was responsible for monitoring all construction and maintenance contractors while they performed their work, and for scheduling and initiating to the Contracts group all requests for construction and maintenance services.

[7]    There were three methods by which Amoco retained services of a construction and maintenance contractor like PICI. The first method was by a "cost-plus" contract. Cost-plus contracts were generally awarded for a particular, specific job or assignment without bidding. The second method was by competitive bidding. However, to avoid overlap of charges for services rendered on cost-

4

Beginning in 1990, PICI and other general maintenance contractors experienced a dramatic decline in their general maintenance work.[8] Because Amoco personnel and BRIS consumed the bulk of Amoco's maintenance jobs, little work was left over for PICI and other maintenance contractors. In 1991, PICI's work load decreased even further when Amoco decided not to renew PICI's service agreements—the primary source of PICI's work.[9] From 1991 to 1994, PICI performed whatever cost-plus work it could obtain. PICI was invited to bid on several jobs when it did not have any cost-plus contract work in the refinery; however, PICI was rarely a successful bidder, as its bids were usually too high. PICI's annual gross revenues from Amoco work dropped from approximately $3.5 million in 1990 to $209,537 in 1994 and $0 for the first half of 1995.[10]

---

plus jobs, companies currently performing cost-plus contract work were not allowed to bid on jobs. Because PICI preferred to do cost-plus work, they seldom performed bid work. The third method for retaining a contractor was with a year-to-year labor contract. PICI had several service agreements with Amoco, including a general maintenance contract, a refinery labor crew contract, a contaminated soil agreement, and an outside lot mowing contract.

[8]    Of these contractors, only PICI was a minority-owned firm.

[9]    *See* note 7, *supra*. The PICI service agreements that were canceled included a general maintenance contract, a refinery labor agreement, a contaminated soil agreement, and an outside lot mowing contract. Bellow conceded at trial that Amoco's decisions not to renew PICI's contracts in 1991 were made for reasons unrelated to Bellow's race. According to Bellow, "my complaint is not that they canceled our contract. My complaint is the way they treated us when we did work in [the refinery]."

[10]    PICI completed its final cost-plus contracts sometime in April 1994, and neither Bellow nor PICI performed any work for Amoco after April 1994.

At around the same time that Amoco implemented its new contract consolidation policy, Bellow started to notice that Amoco was treating him in a manner which he believed to be discriminatory. Specifically, Bellow believed that Jerry Jordan (Jordan), an Amoco employee who worked as a supervisor both with the Contracts group and the PS&C group, was on a mission to "run him out of the refinery" solely because Bellow was African-American.[11] The specific incidents of racial discrimination attributed to Jordan include the following: (1) in 1989, Jordan told Phillips that he believed Bellow made too much money as a field superintendent; (2) in 1989, Bellow learned from Phillips, who in turn had been so informed by Albert De Los Santos (De Los Santos), another Amoco contractor, that Jordan had told De Los Santos "Albert, whenever you drive a white Cadillac or a Lincoln [like Bellow's wife], I'll stop doing business with you because you done made too much money"; (3) in 1990, when Bellow complained to Jordan about racist comments made by Sherman McNown (McNown), an Amoco Turnaround Superintendent, Jordan told Bellow that he could not do anything because he (Jordan) was prejudiced against African-Americans;[12] (4) between 1991 and 1994, when Jordan was supervisor of the PS&C group, Emmanuel Moore (Moore), a contracts specialist with the Amoco purchasing department, received complaints from

---

[11] Jordan worked as a contract specialist with the Contracts group from 1987 to 1990. From October 1990 to September 1991, he was the supervisor of the Contracts group. In September 1991, he became the supervisor of the PS&C group.

[12] Apparently, McNown and another Amoco employee, Dewey Bailey, called Bellow a "nigger" on one occasion.

6

Amoco job representatives that Jordan was treating PICI differently because of Bellow's race; (5) in 1993, Jordan told Melvin Hagler (Hagler), an Amoco job representative, at a job representatives meeting to make sure PICI workers left the refinery as soon as they finished their jobs; (6) in 1993 or 1994, Hagler told Bellow that Jordan did not like him and that "Jerry is going to get you"; (7) in 1994, Hagler told Bellow that he overheard Jordan telling another job representative, Howard Luster (Luster), that he (Jordan) would "run [Bellow's] nigger ass off"; and (8) on March 17, 1994, Jordan canceled a job that had been assigned to PICI earlier that morning.[13]

On September 7, 1994, Bellow filed this lawsuit, "individually and on behalf of" PICI, in the district court below asserting claims against Amoco and Jordan under 42 U.S.C. §§ 1981 and 1985(3),[14] as well as under Texas law for tortious interference with

---

[13] According to Jordan, he canceled the job after he had determined that an Amoco crew would soon complete another job and would be available to take the job assigned to PICI. A few days after Jordan canceled PICI's job, Bellow filed with the Equal Employment Opportunity Commission (EEOC) a charge of discrimination against Amoco. The EEOC dismissed the complaint after it learned that Bellow was not an employee of Amoco.

[14] Section 1981 provides in relevant part:

"**§ 1981. Equal rights under the law**

**(a) Statement of equal rights**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,

7

the right to contract and intentional infliction of emotional distress. On January 11, 1995, an amended complaint was filed adding PICI as a separate plaintiff, so that the plaintiffs became Bellow and PICI,[15] and adding Sherman McNown, Dewey Bailey, and Larry Blow[16] as defendants. Under their section 1981 claims,

licenses, and exactions of every kind, and to no other.

**(b) 'Make and enforce contracts' defined**

For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.

Section 1985(3) provides in relevant part:

"**§ 1985.   Conspiracy to interfere with civil rights**
...
**(3) Depriving persons of rights or privileges**

If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

[15]   Although the amended complaint added PICI as a separate party plaintiff, the caption of the case was never changed in the court record to reflect this amendment.

[16]   Larry Blow (Blow) is a supervisor with the building and maintenance department at Amoco. Bellow alleged that Blow, under Jordan's instructions, told Bellow that PICI did not have a contract on a particular job when, in fact, it did have a contract.

plaintiffs Bellow and PICI alleged that Amoco modified, changed, or terminated PICI's contracts with Amoco and Bellow's contract with PICI. Bellow never contracted with Amoco personally, and he did not bring a section 1981 claim against Amoco for interference with his contractual rights with Amoco.

Thereafter, and before the case was submitted to the jury, the court dismissed plaintiffs' section 1985(3) claims, their section 1981 claims against the individual defendants, and their state law claims against all defendants. The only claims submitted to the jury were plaintiffs' section 1981 claims against Amoco. The jury found that Amoco did not discriminate against PICI on the basis of its race by interfering with its right to contract with Amoco. The jury did find, however, that Amoco discriminated against Bellow because of his race "in terminating, modifying or changing Martin Bellow's right to contract with Phillips Industrial Constructors, Inc.," and awarded Bellow $50,000 in "subjective damages" and $225,000 in punitive damages.[17] Amoco timely filed its notice of appeal to this Court.[18]

### Discussion

#### I.

On appeal, Amoco contends that the district court erred in

---

[17]  Plaintiffs filed a motion for an award of attorneys' fees. The district court stayed consideration of the attorneys' fees application pending final resolution of the case on appeal.

[18]  Neither PICI nor Bellow has appealed the judgment in favor of Amoco on PICI's claims against it or the judgment in favor of Amoco on all of Bellow's other claims (his claims other than his section 1981 claim against Amoco for interfering with his asserted contract, or right to contract, with PICI) against Amoco.

denying Amoco's motion for judgment as a matter of law because Bellow never had a contract with PICI and, therefore, Amoco could not have possibly interfered with Bellow's right to contract with PICI; even if Bellow did have a contract with PICI, there is no evidence that Amoco terminated, modified, or changed that contract; and the evidence is insufficient to support the jury's conclusion that Amoco intentionally discriminated against Bellow on the basis of his race. Amoco also argues that the evidence does not sufficiently support the $50,000 in "subjective damages" and $225,000 in punitive damages.

We review *de novo* the denial of Amoco's motion for judgment as a matter of law, applying the same standards as those applied by the trial court. *Canutillo Independent School Dist. v. Leija*, 101 F.3d 393, 396 (5th Cir. 1996). We review factual issues for the presence of substantial evidence supporting the verdict and legal issues *de novo*. *Heller Financial, Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 523 (5th Cir. 1996). A motion for judgment as a matter of law should be granted by the trial court if, after considering all the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion, the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict.[19] *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969), *overruled on other grounds*, *Gautreaux v.*

---

[19] Amoco timely moved for judgment as a matter of law at the close of the plaintiffs' case-in-chief and at the close of all the evidence.

10

*Scurlock Marine, Inc*., 107 F.3d 331 (5th Cir. 1997) (en banc).

II.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[20]  42 U.S.C. § 1981(b).

To prevail under section 1981, the plaintiff must prove a *prima facie* case of intentional discrimination.  *Wallace v. Texas Tech Univ*., 80 F.3d 1042, 1047 (5th Cir. 1996).  The plaintiff may establish a *prima facie* case by direct evidence or, more commonly, by circumstantial evidence of discriminatory motive.  *Harrington v. Harris*, 108 F.3d 598, 606 (5th Cir. 1997); *Wallace*, 80 F.3d at 1047-48.  To establish a section 1981 claim, the plaintiff must show that (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute; in this case, the making and enforcing

---

[20]    In *Patterson v. McLean Credit Union*, 109 S.Ct. 2363 (1989), the Supreme Court held that post-contract formation allegations of racially discriminatory conduct were not actionable under section 1981, as section 1981 only governs racial discrimination in the "making" of contracts and the right to "enforce" the contract. *Id*. at 2372-74.  Through the Civil Rights Act of 1991, enacted November 21, 1991, Congress expanded section 1981 to include post-contract formation claims.

of a contract.[21]  *See Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994).

                              III.

As a threshold matter, we observe that this Court has not yet decided whether a plaintiff has a cause of action under section 1981 against a third party for interference with the plaintiff's right to make and enforce contracts.  Indeed, on at least one prior occasion we have suggested that such a claim may not be covered by section 1981.  *See Green*, 27 F.3d at 1086-87 (explaining that the plaintiff failed to state a claim under section 1981, as he did not "complain that [defendant] refused to contract with him or that [it] somehow impeded his right to enforce a contract in either the courts or nonjudicial avenues," but merely alleged "that the defendant refused to honor a third-party contract he had with his clients").  Thus, we express some doubt as to whether Bellow has, in the first instance, presented a cognizable claim under section 1981.

Bellow contends that we held in *Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975), that third party interference claims are actionable under section 1981.  We do not read *Faraca* so broadly. In *Faraca*, the plaintiffs successfully sued the director of the Georgia Retardation Center under section 1981, alleging that the director refused to hire Faraca, a Caucasian, because his wife was African-American.  On appeal, we affirmed the judgment, concluding

---

[21]     Of course, as an African-American, Bellow is a racial minority covered by section 1981.

12

that the director could be held personally liable under section 1981 for interfering with the plaintiffs' right to contract with their prospective employer, the State of Georgia. The director in *Faraca* was only nominally a third party. In substance, because he was acting on behalf of the state when he decided not to hire Faraca—thus making his hiring decision indistinguishable from that of the state—the director and the state were essentially one and the same. *Cf. Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986) (holding that plaintiff could bring section 1981 claim against individual members of tenure committee for denying plaintiff tenure if individuals were personally involved in the discrimination and if they intentionally caused the college to violate plaintiff's right to contract), *aff'd on other grounds*, 107 S.Ct. 2022 (1987). Conversely, Amoco never had any such relationship with PICI or Bellow. Amoco exercised no control and had no authority over the contracting decisions of PICI or Bellow. Unlike the situation in *Faraca*, where the third party and prospective contracting party were the same party, Amoco is separate and distinct from PICI, Bellow's contracting party. Since *Faraca*, this Court has not offered any opinion as to whether *all* third party interference claims are actionable under section 1981, and we decline to rule on this issue today.[22]

Instead, we leave for another day the resolution of that issue

---

[22]    At least one other circuit has also expressly declined to rule on this issue. *See Jordan v. Campbell-Taggart, Inc.*, 902 F.2d 28 (tab.), No. 87-3595, 1990 WL 51819, at *2-*3 (4th Cir. April 17, 1990).

13

because even assuming, *arguendo*, that Bellow's claim falls within the ambit of section 1981, Bellow nevertheless is not entitled to any recovery because he has failed to satisfy the third element of his section 1981 claim—that is, that the discrimination concerned one or more of the activities enumerated in the statute. Specifically, even assuming that the evidence justifies a finding that Bellow had some unspecified character of implied contractual relationship with PICI, there is clearly no evidence that Amoco ever modified, changed, or terminated that relationship or Bellow's right to contract with PICI.

Although we assume, for purposes of this appeal, that Bellow had some undefined character of implied contract with PICI, we note that the record is conspicuously devoid of any evidence of any express contract between Bellow and PICI.[23]  At trial, Bellow produced no document and presented no testimony evidencing the terms, provisions, or conditions of any contractual relationship between him and PICI.

Bellow's mere ownership interest in and position as president of PICI does not, in and of itself, suffice to establish a contractual relationship.  Although Bellow, by virtue of his position as president of PICI, assumed certain legal obligations to his company under state law, *see, e.g., Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 719-21 (5th Cir. 1984), these obligations arose from his fiduciary relationship with PICI, not

---

[23]     Bellow has never alleged that he personally had or sought to have any contractual relationship with Amoco; he has alleged only that he had a contract with PICI.

14

from any contractual relationship. *See generally F.D.I.C. v. Dawson*, 4 F.3d 1303, 1307 (5th Cir. 1993) (distinguishing between breach of fiduciary duty claim and breach of contract claim for statute of limitations purposes), *cert. denied*, 114 S.Ct. 2673 (1994); *accord Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Texas*, 20 F.3d 1362, 1374 (5th Cir. 1994). Although we do not doubt that a president of a corporation can (and perhaps usually does) have an employment contract with the corporation, in this case, where the president also happens to be the 51% owner of the company, and the company's executive vice president owns the other 49%, and where there is no evidence of any express contract of any kind (written or oral) between the corporation and the president, it may not simply be assumed that such a contract existed. Bellow has cited no authority, nor has our own research revealed any, suggesting that an individual's status as majority shareholder and president of a corporation, without more, gives rise to a contractual relationship between the individual and the corporation.

Bellow argues that he was paid on an hourly basis which, according to him, conclusively proves that he had an employment contract with PICI. The record flatly contradicts Bellow's assertion, as the evidence shows that he was not paid by the hour, but rather was paid a fixed weekly salary. Bellow presented no evidence indicating that he received an hourly wage, nor did he establish what his hourly pay was or whether PICI docked his pay for time missed. Indeed, the evidence shows that Bellow exercised

15

considerable discretion over his salary, as he and Phillips jointly decided how much they were paid and how much of a bonus they would receive in any given year.  Although Bellow occasionally received overtime pay for working after hours and on weekends, Bellow presented no evidence at trial describing how much he was paid per hour for overtime work (or how this was determined).

IV.

Even assuming, *arguendo*, that Bellow did in fact have a contract with PICI which Amoco *could have* interfered with, Bellow would still be unable to recover any damages because he has failed to present any evidence that Amoco *did in fact* interfere with the contract.  There is no evidence that Bellow's relationship with PICI, contractual or otherwise, was in any way changed, modified, altered, terminated, or otherwise affected by any of Amoco's actions.  Nor is there any evidence that PICI ever failed or refused to honor or comply with any request by Bellow to PICI for it to enter into any contract with Bellow.  Instead, what the record does show is that Bellow remained at all times the 51% owner and president of PICI before, during, and after the alleged discriminatory conduct by Amoco.[24]  *See, e.g., Police Ass'n of New Orleans v. City of New Orleans*, 100 F.3d 1159, 1170-71 (5th Cir. 1996) (explaining that "[i]n deciding whether a change of position rises to the level of a new and distinct relation [under section 1981], the court must compare the employee's current duties,

---

[24]  Indeed, the amended complaint alleges that Bellow is the "President and Chief Executive Officer" of PICI.

16

salary, and benefits with those incident to the new position"); *Harris v. Associates Corp. of North America*, 917 F.2d 195, 197-98 (5th Cir. 1990) (same); *see generally Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996) (stating that "[a] claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest").

In support of his contention that Amoco interfered with his asserted contract with PICI, Bellow directs this Court's attention to the July 1989 incident where Jordan expressed concerns about Bellow's excessive compensation to Phillips and suggested that Bellow spend less time at the Amoco refinery. As the record shows, although Phillips and Bellow discussed the possibility of having Bellow spend more time in the office, they ultimately decided that Bellow would remain in his capacity as field superintendent on Amoco jobs. That Bellow continued to supervise workers in the field, despite Jordan's recommendation, demonstrates not only that Bellow's relationship with PICI remained unchanged, but also indicates that Amoco could not, even had it wanted to, interfere with Bellow's relationship (or contract, if any) with PICI. Certainly, there is no evidence showing otherwise.

Bellow also points to his decrease in income as evidence of Amoco's asserted contractual interference. While it may true that Bellow's income suffered after Amoco allegedly interfered with his asserted contractual relationship with PICI, this loss of income was not a result of any change in his relationship or status with PICI—as he continued to be PICI's 51% owner, president, and chief

17

executive officer—but rather was caused by the fact that PICI no longer received the same high volume of work from Amoco. Bellow performed less work and received a smaller income not because of any decision by PICI to reduce his hours or to cut his salary, but because PICI received less work from Amoco. As PICI had less work, it necessarily follows that Bellow, PICI's president and majority owner, also would have less work and, hence, less income.[25] Although Bellow may not have made as much money as he did when PICI received large volumes of work from Amoco on a consistent basis, there is no evidence that once Amoco's asserted discriminatory endeavor began and PICI's annual revenues plummeted, that PICI reduced Bellow's weekly salary while requiring him to work the same number of hours, that PICI stopped measuring his overtime pay based on extra hours worked, or that PICI in any other way modified or changed his compensation structure. And, as mentioned above, Bellow at all times remained PICI's 51% owner and president.

Stripped of its veneer, Bellow's argument, in essence, is that Amoco interfered with his right to contract with PICI by interfering with PICI's contracts or ability to contract with Amoco. The obvious problem Bellow faces with this argument, of course, is that the jury found that Amoco did not interfere with PICI's contracts, or ability to contract, with Amoco on the basis

---

[25] Moreover, the district court specifically instructed the jury, without objection by Bellow, that Bellow could not recover any damages "for lost income, wages or other earnings" caused by Amoco's alleged discrimination.

18

of race.[26]

Moreover, because Bellow's claim against Amoco is merely derivative of PICI's cause of action, Bellow has no individual section 1981 claim against Amoco. In this regard, we find our decision in *Searcy v. Houston Lighting & Power Co.*, 907 F.2d 562 (5th Cir.), *cert. denied*, 111 S.Ct. 438 (1990), dispositive. In *Searcy*, the president/sole shareholder of an energy resource firm that produced and supplied natural gas sued various utility companies for refusing to enter into long-term natural gas supply contracts with the energy firm. The plaintiff and his company each sued the utility companies under section 1981. We held that the plaintiff could not bring his individual section 1981 claim because the discrimination could only be asserted to invade the legal rights of the corporation and not the rights of the plaintiff, the company's sole shareholder. *Id.* at 565.

Similarly, in this case the legal right that Bellow asserts Amoco violated—that is, the right to contract free from racial discrimination—is indistinguishable from PICI's right to contract under section 1981. The Amoco work that Bellow lost which purportedly gave rise to Bellow's section 1981 claim was the exact same Amoco work that PICI lost. Indeed, Bellow has not alleged, nor does the record reflect, any violation of his contract rights or rights to contract that differs from the violations claimed by PICI against Amoco. *See, e.g., Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981) (holding that shareholders in bank could not

---

[26] And, Bellow does not challenge this finding.

19

maintain section 1983 action in respect to treatment of bank as only the bank suffered any cognizable injury); *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir. 1968) (explaining that a "stockholder's rights are merely derivative and can be asserted only through the corporation" and that this "rule is applicable in cases where the individual is the sole shareholder"). Thus, because Bellow suffered no violation of his contract rights or rights to contract which differs from the violations claimed by PICI, we conclude that Bellow has no individual cause of action under section 1981 against Amoco.[27] *See Flynn v. Merrick*, 881 F.2d 446, 449-50 (7th Cir. 1989) (holding that individual stockholders and debenture holders could not bring suit under 42 U.S.C. § 1983 for damages suffered by the corporation); *Cates v. International Tel. & Tel. Corp.*, 756 F.2d 1161, 1181-83 (5th Cir. 1985) (holding that partner had no individual cause of action for breach of contract, interference with partnership business, loss of value of partnership interest, loss of income, salary or bonus, and damage to reputation and prospective business advantage suffered by partnership); *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. 1981) (holding that bank's shareholders could not recover for fraud, breach of confidential relationship, and conspiracy against purchasers of bank's assets

---

[27] Although Bellow claimed that he sustained emotional damages that were different from PICI's economic damages, his emotional damages result from the same violation that gave rise to PICI's economic damages—Amoco's alleged violation of PICI's right to contract. Bellow does not have an individual claim for an alleged violation by Amoco of PICI's section 1981 rights, whether or not Bellow suffered emotional damage as a result thereof.

because diminution in value of bank's stock was insufficient direct harm to shareholders); *Erlich v. Glasner*, 418 F.2d 226, 228 (9th Cir. 1969) (holding that stockholder, who was president and general manager of corporation, could not maintain individual action under section 1983).

### Conclusion

We hold that Bellow is not entitled to recover any damages under section 1981. Even if Bellow did have some undefined, implied contractual relationship with PICI, nothing in the record supports the jury's conclusion that Amoco in any way altered, modified, or terminated any of his rights thereunder or to contract with PICI.[28] For these reasons, the judgment below is REVERSED and judgment is here RENDERED for Amoco.

REVERSED and RENDERED

---

[28] Moreover, we question whether Bellow was entitled to an award of "subjective" damages. In particular, we do not believe that Bellow's testimony that Amoco's alleged discriminatory acts caused him to feel "less than a man" and "ruined his reputation as a man," without more, sufficiently supports the award of emotional damages. Nor is there any other evidence supporting such an award. *See, e.g.*, *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938–39 (5th Cir. 1996) (reversing $40,000 award for emotional distress under section 1981 where only evidence of emotional distress was plaintiff's own testimony that he felt "frustrated" and "real bad"; that his work environment was "unbearable" and was "tearing my self-esteem down"; and that he felt "angry" and "paranoid" because his supervisor referred to him as a "porch monkey" or "nigger"), *cert. denied*, 117 S.Ct. 767 (1997). Bellow did not testify about any physical harm or injuries, nor did he testify about any stress, emotional pain, or other similar conditions.

However, we need not reach the merits of this issue. Nor do we need to address Amoco's contention that the evidence fails to support the jury's finding of intentional racial discrimination and award of $225,000 in punitive damages.

21