IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 01-10178

---

PAMELA JEFFREY, MD;
PAULA LEWIS, MD,

                                    Plaintiffs-Appellants,

        versus

COLUMBIA MEDICAL CENTER AT
LANCASTER SUBSIDIARY LP,

                                    Defendant-Appellee.

---

Appeal from the United States District Court
for the Northern District of Texas
(3:99-CV-2246-H)

---

August 15, 2002

Before GARWOOD, DeMOSS and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:[*]

        Plaintiffs-appellants Pamela Jeffrey (Dr. Jeffrey) and Paula Lewis

(Dr. Lewis) brought this lawsuit against defendant Columbia Medical

Center at  Lancaster Subsidiary LP (the hospital), alleging that the

---

[*]Pursuant to 5TH CIR. R.47.5 the Court has determined that this
opinion should not be published and is not precedent except under the
limited circumstances set forth in 5TH CIR. R. 47.5.4.

hospital discriminated against them in violation of 42 U.S.C. § 1981.[1]
The district court, after time for discovery, granted the hospital's
motion for summary judgment. The plaintiffs appeal the summary judgment
in favor of the hospital. We affirm.

### Facts and Proceedings Below

Dr. Jeffrey and Dr. Lewis are both board certified
anesthesiologists. They are both African-American. Dr. Jeffrey
joined the staff at the hospital (which was then called Midway Park
Hospital) in 1990. Dr. Lewis also joined the hospital staff in 1990.
They provided anesthesia services to the hospital until 1997. In
1994, Drs. Jeffrey and Lewis, along with Dr. George Jones, formed
Triad Anesthesia Group, PLLC (Triad), a professional limited
liability company. At all relevant times, Drs. Jeffrey and Lewis
have been owners of Triad. (Dr. Jones is no longer a Triad owner and
is not involved in this suit.)

On January 1, 1997, Ernest Lynch (Lynch) became Chief Executive
Officer of the hospital. His duties included oversight of the
hospital's day to day operations and he was authorized to negotiate
and enter into exclusive contracts on behalf of the hospital. In
August 1997, Lynch, on behalf of the hospital, entered into a
contract with North Texas Anesthesia Consultants (NTAC), an outside
group, for NTAC to provide the hospital with anesthesia "call

---

[1] The plaintiffs' complaint also stated a state law claim for
intentional infliction of emotional distress. They do not press that
claim on appeal.

coverage" from August 16, 1997 through September 3, 1997.[2]  Under the contract, NTAC was paid $1,500 per twelve hour period for providing the call coverage.  Prior to this time, the hospital did not pay for call coverage.  Coverage was provided by staff anesthesiologists (including the plaintiffs), who made themselves available for emergency and obstetric procedures on a rotating basis.  The staff anesthesiologists billed for any services rendered, but were not paid for merely making themselves available to take emergency calls.

On September 7, 1997, after getting word through informal channels of the arrangement with NTAC, Dr. Jeffrey wrote to Lynch inquiring about the possibility of a similar arrangement for Triad.[3] Lynch agreed to pay Triad $1,000 per twelve hour period to provide call coverage during September and October 1997.  Dr. Ariba Quansah, an anesthesiologist on the staff of the hospital, was also paid for call coverage at a $1,000 rate during September and October 1997.[4] Dr. Quansah apparently is an African-American.

On August 1, 1997, Lynch informed Triad that the hospital was

_____

[2] Providing "call coverage" meant that NTAC would make anesthesiologists available on short notice to provide anesthesia services for unscheduled procedures such as emergency surgeries or deliveries.  In the case of a scheduled surgery, a surgeon would request an anesthesiologist in advance.

[3] As we explain below, the content of Dr. Jeffrey's letter indicates that she did not entirely understand the details of the arrangement with Triad.

[4] It appears from the record that Dr. Quansah was actually only paid $1,000 per twenty-four hour period, whereas Triad was paid $1,000 per twelve hour period (or $2,000 per twenty-four hour period).

3

considering entering an exclusive arrangement for anesthesia services and that Triad could submit a proposal.  Lynch also solicited proposals from anesthesiology groups that did not practice at the hospital.  Lynch received proposals from Triad, DFW Anesthesia (DFW), and Anesthesia Consultants.  Triad proposed to provide call coverage for a stipend of $20,000 per month.  DFW proposed a $35,000 monthly stipend.  And Anesthesia Consultants proposed a $40,000 monthly stipend.  Lynch awarded the exclusive contract to DFW and the arrangement was effective November 1, 1997.  On October 2, 1997, Lynch sent letters to Drs. Jeffrey and Lewis informing them that, as of November 1, they would no longer be able to exercise their clinical privileges in the hospital, except for secondary consultations, because DFW would become the hospital's exclusive provider of anesthesia services as of that date.[5]

The plaintiffs contend that the hospital's actions in paying NTAC for call coverage at a higher rate than Triad was paid for the same coverage and in awarding the exclusive contract to DFW rather than to Triad, which had submitted the lowest bid, were motivated by racially discriminatory animus.  In support of its summary judgment motion, the hospital offered evidence, including copies of correspondence and Lynch's affidavit and deposition testimony, of legitimate reasons for its actions.  Lynch testified that he entered

---

[5] The uncontradicted evidence is that the same letter was sent to all of the anesthesiologists who were then on staff at the hospital, including several who were white.

4

into the three week contract with NTAC because, in August 1997, he became aware of significant deficiencies in the hospital's existing call coverage system and perceived an urgent need to enact a temporary solution until the problems were resolved. Lynch stated that, when the NTAC arrangement ended, he arranged for Triad and Dr. Quansah to provide the call coverage and paid them at the $1,000 rate only because they were willing to provide the coverage at that rate. Lynch explained that he also felt the lower rate was justified because the plaintiffs and Dr. Quansah were already on staff at the hospital and received income when surgeons at the hospital requested their services for elective surgeries. Regarding the DFW contract, Lynch testified that a primary factor weighing in DFW's favor was its size. Of the three groups submitting proposals, DFW was by far the largest with a total of seventy-seven physicians. According to his testimony, Lynch perceived that a group the size of DFW would be better able to meet the hospital's needs than a smaller group. On or about September 10, 1997, Dr. Jeffrey had informed Lynch that Triad had employed a new physician, Dr. Kevin Thomas, and that Dr. Jeffrey had a medical condition requiring treatment. Thus, at the time Lynch was making his decision, he knew that Triad consisted of only three physicians, one of whom was new and another of whom had a medical condition.

The district court held that the plaintiffs did not have standing to assert the section 1981 claims because the contracts at

5

issue related to Triad as an entity, rather than to the plaintiffs as individuals.  The district court further ruled that, even if the plaintiffs did have standing, they had produced no evidence to rebut the hospital's proof of legitimate, non-discriminatory reasons for its decisions.  The plaintiffs challenge both of these determinations on appeal.

**Discussion**

I. Standard of Review

We review a district court's grant of summary judgment *de novo*, applying the same standard as that employed by the district court.  *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996).  Summary judgment is proper if, after adequate opportunity for discovery, the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986).  The moving party bears the initial responsibility of stating the basis for its motion and identifying the portions of the summary judgment record which it believes demonstrate the absence of a genuine issue of material fact, but is not obligated to support the motion with material negating the opponent's

6

claim.  *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2553, 2554 (1986).  When a proper motion is made, summary judgment should be granted if the nonmovant fails to make a sufficient showing, by appropriate summary judgment evidence, to establish the existence of an essential element of his case on which he will bear the burden of proof at trial.  *Id.* at 2552.  Summary judgment is proper where the summary judgment evidence does not suffice to support a verdict in favor of the nonmovant.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 - 76 (5th Cir. 1994).  "When evaluating the summary judgment evidence, we resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy; that is, when both parties have submitted evidence of contradictory facts."  *Guillory*, 95 F.3d at 1326.

II. Standing

42 U.S.C. § 1981 provides, in pertinent part:

"(a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .

(b) 'Make and enforce contracts' defined. For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

7

Thus, as relevant to this case, section 1981 proscribes racial discrimination that concerns the making or enforcing of a contract. *See Bellows v. Amoco Oil*, 118 F.3d 268, 274 (5th Cir. 1997). The essence of the plaintiffs' claim is that there was a racially discriminatory motivation behind the hospital's decisions to pay Triad less for call coverage than it had paid NTAC and to award DFW the exclusive contract rather than Triad.[6] The district court correctly applied this court's decision in *Bellows* to find that the plaintiffs did not have standing to assert Triad's legal rights under section 1981.

Standing is a jurisdictional question, and thus a question of law that is reviewed *de novo* by this court. *See James v. City of Dallas*, 254 F.3d 551, 562 (5th Cir. 2001). To establish standing, a litigant must demonstrate that he has suffered an injury in fact. *Havens Realty Corp. v. Coleman*, 102 S.Ct. 1114, 1121

---

[6] We note that the nature of the plaintiffs' claims appear to have evolved somewhat from those articulated in the complaint. The complaint alleged that the plaintiffs' medical clinical privileges were terminated for racially discriminatory reasons and that the terminations denied the plaintiffs due process as guaranteed by the hospital's by-laws. It further alleged that, for racially discriminatory reasons, the plaintiffs were denied the same opportunity to submit an exclusive anesthesia services proposal that white anesthesiologists enjoyed. As developed during discovery in the district court, and as pressed by the plaintiffs on appeal, the essence of their claim now is that paying NTAC at the $1,500 rate while paying Triad at the $1,000 rate was disparate treatment and that Lynch's choice of DFW over Triad for the exclusive contract was racially motivated. In their arguments to this court, the plaintiffs do not address the due process allegation or direct our attention to the hospital by-laws and do not contend that they were denied an adequate opportunity to submit a proposal for the exclusive contract.

8

(1982). A civil rights plaintiff shareholder may not establish standing merely by alleging injuries suffered by the corporation alone. *Gregory v. Mitchell*, 634 F.2d 199, 292 (5th Cir. 1981). In *Bellows*, the plaintiff individual, an African-American, was the majority owner and president of Phillips Industrial Constructors, Inc. (PICI). He alleged that defendant Amoco Oil Company, motivated by racial animus, had modified, changed, or terminated contracts with PICI in violation of section 1981. Relying on our previous decision in *Searcy v. Houston Light & Power Co.*, 907 F.2d 562 (5th Cir.), *cert. denied*, 111 S. Ct. 438 (1990), we explained that "because Bellow's claim against Amoco is merely derivative of PICI's cause of action, Bellow has no individual section 1981 claim against Amoco." *Bellows*, 118 F.3d at 276.[7]

This case is analogous to *Bellows* and *Searcy*. The plaintiffs owned and ran Triad, which was a registered professional limited liability company. *Cf. Bellows*, 118 F.3d at 270 (plaintiff was majority owner and president of corporation); *Searcy*, 907 F.2d at 563 (plaintiff was founder and president of corporation). Triad, as an entity, was paid for call coverage and Triad, as an entity, submitted a proposal to provide anesthesia services exclusively. *Cf. Bellows*, 118 F.3d at 276 (essence of plaintiff's claim was that Amoco

---

[7] The plaintiff's name in *Bellows* was Bellow. His name was misspelled in the case caption and the error was never corrected. *Bellows*, 118 F.3d at 270 n.1.

interfered with PICI's contracts or PICI's ability to contract with Amoco); *Searcy*, 907 F.2d at 563 (plaintiff complained that defendants refused to contract with corporation). Thus, it was Triad's right to make and enforce contracts that was allegedly infringed and Triad that had a potential cause of action under section 1981. The plaintiffs, as individuals, have no standing to assert Triad's claims. *Bellows*, 118 F.3d at 276 - 77; *Searcy*, 907 F.2d at 565.

The injuries that the plaintiffs allege – economic loss, embarrassment and humiliation, and loss of professional reputation – are derivative of Triad's potential cause of action. The plaintiffs argue that, at least, their embarrassment and humiliation and professional reputation injuries are separate and distinct from any injuries suffered by Triad.[8] We rejected the same line of reasoning in *Bellows*, wherein we explained "[a]lthough Bellow claimed that he sustained emotional damages that were different from PICI's economic damages, his emotional damages *result from the same violation* that gave rise to PICI's economic damages -- Amoco's alleged violation of PICI's right to contract." *Bellows*, 118 F.3d at 277 n.27 (emphasis added). Whether or not they suffered separate and distinct damages,

---

[8] The hospital asserts that the plaintiffs may not properly raise these non-economic injuries on appeal because, in the district court, they did not argue loss of professional reputation and they alleged embarrassment and humiliation only in connection with Dr. Lewis's intentional infliction of emotional distress claim, which has been abandoned on appeal. We need not decide whether these issues are properly before us because, as we explain, all of the alleged injuries derive from the same alleged conduct.

10

the plaintiffs do not have individual claims for alleged violations of Triad's section 1981 rights. *Id.*

The plaintiffs argue that special considerations apply in the context of a physician's relationship with a hospital and urge this court to adopt the holding of *Gomez v. Alexian Bros. Hospital*, 698 F.2d 1019 (9th Cir. 1983) (*per curiam*). In *Gomez*, the plaintiff was a physician who owned a professional corporation for providing emergency room services. The corporation was denied a contract to operate the defendant hospital's emergency room, allegedly because the plaintiff and other physicians in his group were Hispanic. The Ninth Circuit found that Gomez, as an individual, had standing to assert a Title VII claim because he had alleged personal and distinct injuries – the failure to award the contract to his company deprived him of employment as director of the hospital's emergency room and caused him humiliation and embarrassment. *Id.* at 1021. The court stated that the same analysis applied to Gomez's section 1981 claim. *Id.* at 1022.

To the extent that *Gomez* is inconsistent with our holding in *Bellows*, *Gomez* does not state the law in this circuit. In *Bellows*, we explained that "[t]he Amoco work that Bellow lost which purportedly gave rise to Bellow's section 1981 claim was the exact same Amoco work that PICI lost." *Bellows*, 118 F.3d at 277. In this case, any work that Drs. Jeffrey and Lewis lost was the exact

11

same work that Triad lost.  The hospital entered an exclusive agreement with DFW, meaning that only physicians affiliated with DFW would be supplied with anesthesia service employment (except on a secondary consultation basis).  Had the hospital signed an exclusive contract with Triad instead of DFW, then only physicians affiliated with Triad would have received this work.  The October 2, 1997 letters from Lynch to the plaintiffs did not terminate the plaintiffs' clinical privileges to practice medicine at the hospital. The letters merely informed the plaintiffs that they would not be able to exercise those privileges (except on a secondary consultation basis) while DFW had an exclusive arrangement with the hospital.  In other words, the plaintiffs were informed that they would be receiving no more first consultation work from the hospital because that work would all go to physicians in the DFW group.  The plaintiffs' clinical privileges were eventually terminated after a period of inactivity.  But we are aware of no evidence indicating that the hospital would have refused to permit the plaintiffs to continue exercising their clinical privileges if they had chosen to affiliate with DFW.  As far as the evidence indicates, these plaintiffs lost work only because Triad lost the contract.  The fact that the owners of Triad are physicians with clinical privileges at the defendant hospital does not provide a principled reason to carve

12

out an exception to our section 1981 standing requirements.[9]

We conclude that the district court correctly held that the plaintiffs did not have standing to assert Triad's section 1981 claims.  Furthermore, as we now explain, even if these plaintiffs did have standing, we agree with the district court's determination that they did not produce sufficient evidence of discrimination to withstand summary judgment.

II. Sufficiency of Evidence

> "To prevail under section 1981, the plaintiff must prove a *prima facie* case of intentional discrimination. The plaintiff may establish a *prima facie* case by direct evidence or, more commonly, by circumstantial evidence of discriminatory motive. To establish a section 1981 claim, the plaintiff must show that (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute; in this case, the making and enforcing of a contract."
> *Bellows*, 118 F.3d at 274 (internal citations omitted).

Assuming, *arguendo*, that these plaintiffs did have standing to assert a section 1981 claim, the first and third prongs of such a claim are clearly satisfied.  Thus, the issue to be decided is whether the plaintiffs made a sufficient showing on the second prong – intentional discrimination based on race – to survive summary

---

[9]We observe that the reasoning in *Gomez* did not rest on any special considerations regarding the professional relationship between physicians and hospitals.  For the *Gomez* court, the inquiry was whether the defendant's conduct interfered with Gomez's employment opportunities, not whether there was anything special in the nature of the physician-hospital relationship.  *See Gomez*, 698 F.2d at 1021; *see also Diggs v. Harris Hospital-Methodist, Inc.*, 847 F.2d 270, 273 (5th Cir. 1988) (explaining *Gomez*).

judgment.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (plaintiff must prove racially discriminatory purpose of act to show section 1981 violation).  As is common in discrimination cases, these plaintiffs attempt to prove this element with circumstantial evidence.[10]  Claims of racial discrimination brought under section 1981 are governed by the same evidentiary framework that applies to claims of employment discrimination under Title VII. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996).  This framework was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 93 S.Ct. 1817 (1973) and the elements of the plaintiff's *prima facie* case will necessarily vary according to the nature of the claim and the facts of the case. *LaPierre*, 86 F.3d at 448 & n.3.

As applied to the facts and nature of this case, the plaintiffs could make a *prima facie* case of intentional discrimination by showing (1) that they are members of a protected class (this is

---

[10] The only arguably direct evidence of intentional discrimination was the deposition testimony of a Dr. Bader (who was not an employee, officer, or agent of the hospital) who stated that he told the plaintiffs that he thought it was a possibility that Triad was denied the exclusive contract because Drs. Jeffrey and Lewis were black.  The plaintiffs do not direct our attention to any evidence showing that Dr. Bader had any basis or reason to know what motivated Lynch's decision. Dr. Bader testified specifically that Lynch had never told him that the plaintiffs' race played any role in the decision to award the contract to DFW and Dr. Bader did not offer any explanation of his grounds for believing that discrimination was a possibility.  Without more, Dr. Bader's testimony concerning what he said he thought was a possibility cannot be regarded as probative direct evidence of discriminatory intent on the part of the hospital.

14

clearly satisfied), (2) that they sought and were qualified to receive an available contract, (3) that their contract proposal was rejected or that they received a contract on unfavorable terms, and (4) that a similarly-situated person or entity that was not in a protected class received a contract for which the plaintiffs were rejected or received a similar contract on more favorable terms. *Cf., e.g.*, *Raggs v. Mississippi Power & Light Co.*, No. 00-60874, slip. op. 1361 at 1366 (5th Cir. Jan. 3, 2002) (elements in a discriminatory discharge case); *LaPierre*, 86 F.3d at 448 (elements in a discriminatory hiring case); *Wallace*, 80 F.3d at 1048 (plaintiff's section 1981 complaint alleged discrimination in refusing to renew employment contract and in differential payment terms under the original contract). For our analysis, we will assume *arguendo*, as did the district court, that these plaintiffs established a *prima facie* case of intentional discrimination.[11]

Once the plaintiff makes a *prima facie* case for discrimination, an inference of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. *LaPierre*, 86 F.3d at 448. "If the defendant comes forward with a reason which, if believed, would support a finding that the challenged action was

---

[11] We are not entirely satisfied that the plaintiffs have actually done so. As one example of a possible deficiency, the plaintiffs do not appear to have produced competent evidence to show that either NTAC or DFW were white-owned entities.

15

nondiscriminatory, the inference [of discrimination] raised by the plaintiff's prima facie case drops from the case." *Id.* Once the defendant has produced evidence of a legitimate, non-discriminatory explanation, the plaintiff must produce evidence which would support a finding that this explanation is pretextual. *Texas Dep't of Community Affairs v. Burdine*, 101 S.Ct. 1089, 1093 (1981); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). The defendant's burden is only one of production, not persuasion. *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2106 (2000). The plaintiff at all times has the burden of persuasion. *Id.*

The hospital articulated legitimate, non-discriminatory reasons for paying NTAC $1,500 per twelve hour period for call coverage for three weeks and later paying Triad $1,000 per period for the same coverage. Lynch provided affidavit and deposition testimony reflecting the following: Lynch perceived that the hospital was facing a crisis in call coverage for anesthesia services in August 1997. At that time, the hospital's anesthesia service needs were being served by Triad, another anesthesiology group called TX-AN, and a few independent anesthesiologists (including Dr. Quansah). Prior to mid-August 1997, call coverage was handled by rotating the responsibility among these physicians and no one was compensated for providing call coverage. (Of course, a physician who was actually called in to provide anesthesia services for an unscheduled procedure

16

would be paid for that work.)  Lynch believed that there was an

urgent need to bring in an outside entity to handle call coverage

while a permanent solution to that problem was found.  NTAC was

available to provide the coverage but would accept nothing less than

the $1,500 stipend to do so.  NTAC provided call coverage at the

$1,500 rate from August 16, 1997 through September 8.  Triad and Dr.

Quansah agreed to provide call coverage on a rotating basis from

September 8, 1997 through October and they required only a $1,000

stipend to do so.[12]

Much of Lynch's testimony was corroborated by copies of

correspondence and other documentation.[13]  There was also

uncontroverted evidence that Lynch and Dr. Huang, chairman of the

hospital's surgery department, reprimanded three anesthesiologists,

including Dr. Lewis, for failure to respond to calls for anesthesia

services in July and August 1997.  (The other two physicians who were

so reprimanded were white males associated with TX-AN.)  Dr. Lewis

---

[12] Lynch's affidavit states that Triad and Dr. Quansah were each paid $1,000 "per day" for call coverage, but invoices and canceled checks included in the record indicate that Triad was paid $1,000 per twelve hour period whereas Dr. Quansah was only paid $1,000 per twenty-four hour period.

[13] We note, however, that Dr. Jeffrey's letter of September 7, 1997 did not contain a clear proposal for Triad to provide call coverage for the $1,000 rate.  Dr. Jeffrey wrote, "It has also been brought to our attention that the Hospital has implemented a new payment plan for call coverage services in the amount of *$1,000 per person per call* as is evidenced by its agreement with the other anesthesia group that also currently provide call coverage to the hospital." (emphasis added). This description indicates that Dr. Jeffrey did not have a correct understanding of the $1,500 stipend arrangement with NTAC.

17

does not dispute that she failed to respond to a call in July 1997 or that there was over a two hour wait before anyone at Triad responded to the call. Dr. Lewis asserts that, at the time of the call, she was on a planned vacation, that she had notified the hospital that she would be unavailable, and that the call was only placed as the result of a clerical error on the hospital's part. For the purposes of summary judgment, we assume that Dr. Lewis's explanation is true. But this incident and the two similar incidents that were proximate in time still support Lynch's perception that there was a need to improve call coverage.

The burden thus shifted back to the plaintiffs to produce adequate evidence that the hospital's articulated reasons were pretextual. The plaintiffs need not affirmatively show that racial discrimination was the real reason for the different contract terms; a jury may usually infer the ultimate fact of discrimination if it is persuaded that the defendant's explanation is false. *See Reeves*, 120 S.Ct. at 2108. But, to survive summary judgment, these plaintiffs had to produce *some* evidence that Lynch's explanation *was* false. *See id.* This they did not do. On appeal, the plaintiffs rely simply on assertions that a jury could find Lynch's testimony to be false. Such a finding would indeed be in the province of the jury, but the plaintiffs do not satisfy their burden by their mere conclusory assertion of it. The hospital satisfied its burden of production by producing Lynch's testimony. That evidentiary burden involves no

18

credibility assessments.  *Russell*, 235 F.3d at 222.

The hospital also articulated legitimate, non-discriminatory reasons for awarding the exclusive contract to DFW.  Again, these reasons were offered primarily through testimony by Lynch, corroborated by correspondence and documents.  Again, in determining whether the hospital has satisfied its burden of production, we can make no credibility assessments.  Lynch explained that a primary factor in the decision was DFW's large size and the perception that the seventy-seven physician group would be the most likely to have the resources to meet the hospital's continuing anesthesia services needs.  During the time he was making the decision about the exclusive contract, Lynch was aware that Triad had only three physicians, one of whom was new to the group and another of whom had a medical condition requiring treatment.  According to Lynch, four DFW anesthesiologists had been awarded temporary privileges to practice at the hospital as of October 29, 1997 and, later, additional DFW physicians were awarded privileges and provided anesthesia services under the exclusive contract.

Again, the plaintiffs do not point to any evidence tending to prove that Lynch's explanation was false.  The plaintiffs again rely primarily on a conclusory assertion that a jury could find that Lynch was testifying falsely.   The plaintiffs concede that DFW had seventy-seven physicians in its group, but point out that DFW, which also provided anesthesia services to other facilities, was not

19

obligated to put all seventy-seven physicians at the hospital's disposal at any one time.  This fact, which, for summary judgment purposes, we assume to be true, does not negate Lynch's testimony that he perceived DFW's overall size and available resources gave DFW an advantage in being able to meet the hospital's anticipated needs. The plaintiffs do not dispute that DFW already had four physicians with clinical privileges prior to the effective date of the exclusive arrangement and that this number was already greater than Triad's overall size.  As discussed above, there was evidence that Triad failed to respond promptly to a call for service in July 1997. Although we accept as true Dr. Lewis's testimony that the incident resulted from the hospital's clerical error, Triad's delay in responding supports Lynch's contention that Triad's small size was a consideration.  A seventy-seven physician group may be better able to respond in such a situation than a three physician group.

There was also evidence that, in April 1997, Dr. Lewis was reprimanded for failure to supervise one of Triad's certified registered nurse anaesthetists, in violation of hospital policies.  In her deposition testimony, Dr. Lewis admitted that the violation had occurred.  It would not have been unlawful for the hospital to take such an incident into account when deciding whether to award the contract to Triad.  *Cf. Price Waterhouse v. Hopkins*, 109 S.Ct. 1775, 1784 (1989) (Title VII prohibits employers from taking certain factors into account when making

20

employment decisions, but does not limit other factors that may be taken into account).

The plaintiffs, who at all times had the burden of persuasion, were required to put forth at least some evidence that the hospital's explanation was unworthy of credence. *See Reeves*, 120 S.Ct. at 2108. To satisfy their burden of proving intentional discrimination, at a minimum, the plaintiffs had to combine their *prima facie* case with sufficient evidence to find that the hospital's explanation was false. *See id.* at 2109. To survive summary judgment, the plaintiffs had to show that there was an actual controversy over the veracity of the hospital's explanation by submitting evidence of contradictory facts. *See Guillory*, 95 F.3d at 1326; *cf. Russell*, 235 F.3d at 225 (employment discrimination defendants were not entitled to judgment as a matter of law when plaintiff had produced substantial evidence countering defendants' explanation).

### Conclusion

These plaintiffs did not have standing to assert Triad's section 1981 claims. Even if the plaintiffs did have standing, they did not produce evidence sufficient to create genuine issues of material fact and thus survive summary judgment. Accordingly, the judgment of the district court in favor of the hospital is AFFIRMED.